UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMERICAN GUARANTEE AND | § | |
| LIABILITY INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:18-CV-382 |
| | § | |
| ACE AMERICAN INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

The Court submits the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## I.    BACKGROUND

This case concerns a primary insurer's duty to accept settlement offers within its insurance layer. Specifically, this case is brought by a secondary insurer who contends that the primary insurer should have accepted a settlement offer within the limits of the primary insurer's coverage.

Plaintiff American Guarantee and Liability Insurance company ("AGLIC," also referred to as "Zurich") filed suit against Defendant ACE American Insurance Company ("ACE," also referred to as "Chubb") on February 9, 2018, seeking relief under Texas state law. (Doc. No. 1).

1. This Court ruled on dispositive motions on May 23, 2019. The Court denied ACE's Partial Motion for Summary Judgment (Doc. No. 24) and granted AGLIC's Partial Motions for Summary Judgment (Doc. Nos. 22, 46). The Court decided that all three settlement offers at issue in this case were unconditional, within ACE's policy limits, and included offers for full release. The Court also found that AGLIC did not have an obligation to mitigate

1

damages. After the Court ruled on the dispositive motions, the parties settled AGLIC's breach of contract claims.

2. On June 17, 2019, this Court commenced a bench trial on AGLIC's state insurance law claims under *Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929). Over the course of the five-day trial, the Court received exhibits and heard sworn testimony. Having considered the exhibits, testimony, and oral arguments presented during the trial, post-trial filings, and having considered the applicable law, the Court sets forth the following Findings of Fact and Conclusions of Law.

## II.    FINDINGS OF FACT

<u>The Insurance Plans</u>

3. AGLIC and ACE both insured The Brickman Group Ltd., LLC ("Brickman"), a landscaping company. Brickman's insurance included a $500,000 deductible/self-insured retention ("SIR"), a $2,000,000 primary business auto policy issued by ACE, a $10,000,000 excess policy issued by AGLIC to immediately follow the ACE policy, and a $40,000,000 excess policy issued by Great American Insurance Company ("Great American") to follow the AGLIC policy. (Tr. 987, 992; Skogstrom Depo).

<u>The Underlying Lawsuit</u>

4. On Friday, May 16, 2014, Mark Braswell ("Braswell") hit the back of a Brickman landscaping truck while riding his bicycle and sustained fatal head injuries. The accident took place on a sunny afternoon in the 18400 block of North Bridgeland Lake Parkway in Cypress, Texas. (Pl. Exh. 32).

5. Braswell's immediate survivors include his mother Sandra Braswell, his wife of twenty years Michelle Braswell, his 13-year-old son Matthew Braswell, and his 9-year-old

daughter Mary Braswell. (Pl. Exh. 49).

6. Braswell's survivors filed suit against Brickman and the driver of the Brickman truck, Guillermo Bermea, in Cause No. 2015-38679, *Michelle Lynn Braswell, et. Al. v. The Brickman Group, Ltd., LLC* in the 127th Judicial District Court of Harris County, Texas (the "Underlying Lawsuit"). (Pl. Exh. 36).

7. Richard Mithoff represented the plaintiffs in the Underlying Lawsuit. (Tr. 429; Mithoff Live). Andrew Leibowitz and Bo Berry of the Berry Firm in Dallas represented Brickman and Bermea in the investigation and lawsuit. (Tr. 200; Leibowitz Depo).

Insurance Company Personnel

8. In January 2016, Gabriel Adamo ("Adamo") took over responsibility for the file on behalf of ACE. (Tr. 98; Adamo Depo). Adamo's immediate supervisor was Robert Albin ("Albin"), an ACE Assistant Vice-President. Albin was supervised by Russell Smith ("Smith"), an ACE Vice-President. (Tr. 49; Adamo Depo).

9. AGLIC received notice of the accident and Underlying Lawsuit in January 2016. Terese Kerrigan ("Kerrigan") assumed responsibility for the file on behalf of AGLIC. (Tr. 402, 411; Kerrigan Live).

10. When Kerrigan and Adamo became involved, Brickman's third-party administrator, ESIS, had primary responsibility for adjustment of the claim. The ESIS representative working on the claim was Cheryl Nowak ("Nowak"). (Tr. 180; Nowak Depo). Denise Skogstrom ("Skogstrom") was Brickman's Claim Manager.

Internal Assessments of Liability and Damages

11. Nowak requested that defense counsel prepare a pre-trial report to help the carriers with their evaluation and prepare for mediation. (Tr. 189-192; Nowak Depo). She asked that

3

this include a verdict search of related cases in the venue to help determine the anticipated verdict range. (Tr. 190-191; Nowak Depo).

12. In July 2016, Brickman tendered its remaining SIR to ACE through its third-party administrator, ESIS. At that point, ACE took over handling Brickman and Bermea's defense and settlement negotiations. (Tr. 277-278; Kerrigan Live).

13. In defense counsel's view, they had a very strong liability case. (Tr. 922; Berry Depo). The defense theory was that Braswell was responsible for the accident because he was not paying attention when he was cycling. (Tr. 154-155; Adamo Depo). In support of this theory, the defense had evidence that Braswell's injury was to the top of his head, not to his face. His helmet had also cracked down the middle. This indicates that his head was down and, therefore, he was not looking ahead of him for obstacles. (Tr. 301; Kerrigan Live). The mark that Braswell's helmet made on the Brickman truck also supported this theory. (Tr. 722; Kerrigan Live). The physical evidence was very compelling for the defense. (Tr. 862; Leibowitz Depo).

14. The known weaknesses in the defense case included the fact that the Brickman driver, Bermea, would testify that, although it was legal, he thought it was dangerous to park in an active lane of travel on that road. (Tr. 145-146; Adamo Depo). The defense did not put on any evidence to explain why Brickman allowed trucks to stop on the road. (Tr. 454; Mithoff Live).

15. Bermea was also inconsistent in his recollection of how long he had stopped on the road; he initially said that the truck was parked for four to five minutes, but in his deposition said one to two minutes. The plaintiffs at trial argued that the truck was stopped for less than twenty seconds. (Tr. 295; Kerrigan Live). This dispute strengthened the plaintiffs' "stop

short theory" that Bermea suddenly stopped to pull over to do some work and Braswell hit

the truck because he didn't have enough time to react. (Tr. 296; Kerrigan Live).

16. Relatedly, there were no cones out around the Brickman truck at the time of the accident,

and there was dispute about whether flashers were on. (Tr. 432; Mithoff Live; Tr. 940;

Berry Depo (stating that he had hard evidence that the flashers were on)). Again, this

supported the stop short theory because the plaintiffs could argue that, had the truck been

stopped for a few minutes, the driver would have had time to put cones out before the

accident occurred. (Tr. 432-433; Mithoff Live).

17. Another known substantial weakness was the fact that Braswell and his family were very

sympathetic. (Tr. 186; Nowak Depo (testifying that sympathetic damages were a known

factor that led to potential exposure from the early stages of ESIS's claim investigation);

(Tr. 202-203; Leibowitz Depo). At trial, the plaintiffs presented testimony from two former

fire chiefs about Braswell's commitment to service, his love of family, and his bravery.

(Tr. 438; Mithoff Live). The plaintiffs also presented testimony about the day of the

accident and the trauma to the family. (Tr. 441; Mithoff Live; Pl. Exh. 229). Braswell and

his wife were firefighters and triathletes. Braswell was a Captain with the City of Houston

Fire Department and Assistant Chief with the Cy-Fair Volunteer Fire Department. (Pl. Exh.

49). He had been recognized as a hero for rescuing a double amputee from a burning

building. (Tr. 438; Mithoff Live).

18. Braswell's wife and children sought counseling after Braswell's death. (Pl. Exh. 109). His

daughter Mary started cutting herself in October 2015, attempted to overdose, and spent a

week in a mental health hospital in 2016. Mary blamed herself for her father's death

because he was en route to pick her up from school when the accident occurred. After the

accident, she left letters for her deceased father at a tree near the accident site. (Tr. 441; Mithoff Live).

19. The trial judge and plaintiffs' counsel were also known weaknesses. Leibowitz testified that the trial judge "tended to favor the plaintiff side and more than likely close rulings would go against us." (Tr. 204; Leibowitz Depo). He testified that Mithoff "would represent his clients very well and do an excellent job, and be one of the better trial attorneys in Harris County." (Tr. 206; Leibowitz Depo).

20. Leibowitz prepared a Case Summary and Evaluation on August 10, 2016 (the "August Memo"). In the August Memo, Leibowitz estimated the range of potential verdict to be between $6,000,000 and $8,000,000. He said that the plaintiffs' expert put economic damages between $2.85 million and $3.365 million, which was "certainly reasonable." He stated:

> Based upon all the foregoing, we believe this is a defensible case on behalf of Brickman. We believe that it is likely that the jury will find that Defendants were not negligent. However, even if a jury were to find that Defendants were negligent, we believe that a jury would find a significant amount of contributory negligence on the part of Mr. Braswell with a very good chance of Plaintiff's negligence exceeding 50%. As you know, if a jury were to determine that Plaintiff's contributory negligence exceeded 50% he would be barred from any recovery. At this time, we believe that if we tried this case 10 times that we would get a finding of no negligence on behalf of Defendants or a verdict where Plaintiff's negligence exceeds 50%, 7 out of 10 times. If Plaintiff's negligence does not exceed 50%, we believe that in most cases a jury would find Plaintiff's negligence to be in the range of 30-50%.

Leibowitz concluded that the case had a settlement value in the range of $1,250,000-$2 million. (Pl. Exh. 16, at 9).

21. Adamo and Albin calculated the settlement value at $600,000. Adamo testified that he reached this number by multiplying ACE's policy limit of $2 million by 30%, Leibowitz's

estimate of the likelihood of a plaintiff verdict. Albin agreed with this analysis. (Tr. 60-61; Albin Depo). Smith, on the other hand, agreed that the settlement value reached by ACE was $600,000, but disagreed that they reached that value by calculating 30% of the $2 million policy limit. He said that they reached the value by "looking at ground up what the value of the case was." (Tr. 576-577; Smith Live). However, the ACE claim log clearly states that ACE believes that "we have an approximately 70% chance of a defense verdict .... Therefore, we are reserving at 30% of our limits and will attempt to settle with plaintiff up to that amount." (Pl. Exh. 7, at ACE_004361).

22. ACE conducted jury research on September 21, 2016. The research involved two focus groups. One focus group resulted in a hung jury. In that group, four of eight mock jurors assigned 10% liability to Braswell and 90% to Bermea, three assigned 90% liability to Braswell and 10% to Bermea, and one assigned 60% liability to Braswell and 40% to Bermea. The other group rendered a defense verdict assigning 100% of responsibility to Braswell. (Pl. Exh. 4).

23. The mock jurors heard testimony that Brickman's driver did not break any laws and had not received any citations. (Tr. 52; Albin Depo). The mock jurors who sided with the plaintiffs believed that the truck must have stopped short or cut Braswell off so that he could not react in time. The end of the mock juror report states: "It will be important to make clear to jurors that there is no evidence that Mr. Bermea cut off Mr. Braswell or stopped suddenly in front of him." (Tr. 53; Albin Depo). Also, even pro-defendant mock jurors felt that the truck was dangerously parked. (Pl. Exh. 4). The mock jury did not hear evidence about Mary Braswell cutting herself, her attempted suicide, her hospitalization in the aftermath of her father's death, or the fact that she left notes for her father near the

accident site. (Tr. 598; Smith Live).

24. The mock jury gave defense counsel insights about trial strategy. (Tr. 224; Leibowitz Depo).

25. After the mock jury, Kerrigan made an entry in the AGLIC claim log stating that the results were "favorable" and the "risk neutral is no more than 500k, not primary's 2M." CITE. Kerrigan testified that this entry was based on Adamo's summary of the focus group; she wasn't able to participate herself, so Adamo "gave [her] the highlights, and he highlighted the defense verdict on the one panel." She read the report later. (Tr. 310; Kerrigan Live).

26. A few days after the mock jury, on September 26, 2016, Adamo sent an email to Leibowitz, Skogstrom, and Kerrigan stating: "I feel for settlement purposes that this is more of a six figure case than seven figure case. . . . I have spoken to Terese [Kerrigan] and we are both of the same view." (Pl. Exh. 5). Kerrigan testified that she did not necessarily agree with that, but she "d[id]n't get involved in the primary strategy as long as they're trying to resolve the case." (Tr. 313-314; Kerrigan Live).

27. Mediation was scheduled for October 3, 2016. (Tr. 104; Adamo Depo). It was unsuccessful because the offers were too far apart. (Tr. 107; Adamo Depo). At the mediation, the plaintiffs' initial demand was $7.5 million; the defendants' initial offer was $100,000. (Tr. 118; Adamo Depo). After the mediation, Skogstrom informed Brickman's chief legal counsel that the defense side had determined that the plaintiffs would probably settle for $2 million: "[W]e came up to $200K to see if they were going to come down slowly until we reached a number they would settle for which we all determined is probably $2M." (Pl. Exh. 212, at 353.). Skogstrom had previously made an entry in the Brickman system stating: "We all feel we have some very good defenses and value the case between $2-

3M." (Pl. Exh. 212, at 354). Skogstrom testified that, when she said that they "valued" the case, she was referring to the settlement value of the case. (Tr. 1014-1016; Skogstrom Depo).

28. As of February 2017, Leibowitz continued to believe that the settlement value of the case was $1,250,000-$2 million. (Pl. Exh. 61). His opinions had not changed before trial in April 2017. (Tr. 221; Leibowitz Depo).

29. On February 14, 2017, Kerrigan received the defense expert reports and emailed Adamo that they "kill." She said that she "love[d] our case." (Pl. Exh. 124). The expert reports supported the defense arguments that the physical evidence demonstrated that Braswell was looking down when the accident happened. (Tr. 318-320; Kerrigan Live).

30. On April 5, 2017, Kerrigan contacted a mediator in Houston named Bob Black. Black told her that Mithoff was "a formidable opponent" and "has a huge presence in Houston, very well regarded personally and professionally." (Pl. Exh. 126; Tr. 324; Kerrigan Live). Black also told her that the trial judge, Judge Sandill, "tended to lean towards the plaintiff" on discretionary rulings. (Tr. 325; Kerrigan Live).

31. Kerrigan also reached out to Houston area attorney Kent Adams. Adams told her that a Harris County jury would never decide that Braswell was 51% or more responsible because of the sympathy factor. (Tr. 327; Kerrigan Live). Adams also provided Kerrigan with information about Mithoff and Judge Sandill consistent with Black's assessment. (Tr. 328; Kerrigan Live).

32. Kerrigan testified that she did not know about Mithoff or Judge Sandill's reputations until she spoke to Black and Adams in the first week of April 2017, although she has since learned that the defense attorneys and ACE were generally aware of this information. (Tr.

747-748; 755; 845; Kerrigan Live). Leibowitz testified that he considered the judge, venue, and Mithoff when he wrote the August 2016 memo. (Tr. 864-865; Leibowitz Depo).

33. Kerrigan testified that what she learned from Black and Adams changed her assessment of the case. She told Adamo about what she learned. (Tr. 331-332; Kerrigan Live).

34. The trial court ordered the parties to a second mediation on April 4, 2017. (Pl. Exh. 9, at 5).

35. Before the second mediation, on April 5, 2017, Skogstrom emailed Leibowitz to ask whether there was any chance that the case would settle. Leibowitz responded: "I would say no chance for $1 million and below. Decent chance for close to or at $2 million. After that [i.e., with a settlement offer over $2 million], a much better chance. I think they would be crazy not to take between 1.5-2 million." (Pl. Exh. 9). Leibowitz testified that close to or at $2 million was "ultimately" what his evaluation was. (Tr. 228-229; Leibowitz Depo). He did not think that the plaintiffs would settle for under $1 million on the eve of trial "after all the amount of time and energy that the plaintiffs put into the case." (Tr. 228; Leibowitz Depo).

36. The second mediation was unsuccessful. Kerrigan testified that she communicated with ACE's representative at the mediation, Jonathan Mulvihill, by text throughout the negotiations. She encouraged him to offer higher amounts closer to the primary limit of $2 million, but Mulvihill refused because "Plaintiff refused to negotiate under policy limits. (Tr. 340-348; Kerrigan Live). Kerrigan testified that the mediator told her that he thought the case was worth the primary limit of $2 million. (Tr. 351; Kerrigan Live).

The Settlement Offers & The Trial

37. After the second mediation, on April 13, 2017, Mithoff sent a *Stowers* demand for

$2,000,000 (the "First Demand"). (Pl. Exh. 12).

38. Leibowitz forwarded the offer to Adamo, Albin, and Kerrigan. Adamo was unavailable, so
    Albin responded on behalf of ACE and asked Leibowitz for a copy of the August Memo,
    which Leibowitz sent. (Pl. Exh. 15).

39. Leibowitz did not recall that ACE asked him if the First Demand was reasonable or whether
    ACE should accept it. (1Tr. 231-232; Leibowitz Depo). Leibowitz did not recall that
    anyone from ACE asked him whether he would recommend settlement for $2 million at
    any point through trial. (1Tr. 235; Leibowitz Depo).

40. Kerrigan emailed Adamo to demand that ACE accept the First Demand:

> As you know, our mutual insured's defense counsel evaluation of
> the Braswell claims includes a risk of a verdict in excess of the
> Chubb 2M primary limit. Defense counsel also evaluates the
> Braswell case for settlement up to your 2M limit. In other words,
> defense counsel does not opine that a defense verdict is a certainty
> or that an adverse verdict will not exceed Chubb's primary limit.
> There is no such certainty given a variety of factors including, but
> not limited to: the well-regarded reputation and success of Mr.
> Mithoff; the expectation that Judge Sandill will favor plaintiffs, as
> he usually does, including on evidentiary issues; the $2.8M-
> $3.365M lost earning claim (deemed 'certainly reasonable' by
> defense counsel); respective consortium claims of the surviving
> spouse and two children; a conscious pain and suffering claim;
> sympathy factor for the surviving family; and the remote chance of
> a 51% fault allocation on the late Mr. Braswell by a Harris County
> jury. Therefore, Zurich agrees with defense counsel that a gross
> verdict could be as high as $8 million (if not more), which supports
> that the $2 million Stowers demand is reasonable.

(Pl. Exh. 14).

41. ACE did not accept the First Demand, but instead counteroffered $500,000. (Pl. Exh. 19).
    Leibowitz wrote to another partner at the Berry Firm: "They did not want to offer any more.
    We convinced them to since we were constantly saying they needed to get to $2 million
    and it would look bad not to counter when they finally did." (Pl. Exh. 67).

42. Trial in the Underlying Lawsuit began on April 24, 2017. (Tr. 234; Leibowitz Depo).

43. ACE sent a third-party administrator, Ray Wheeler ("Wheeler"), to attend trial. Adamo testified that the purpose of a third-party administrator was to get case summaries more quickly, take pressure off of defense counsel, and get more objective feedback about the progress of the case. (Tr. 137; Adamo Depo).

44. On April 24, 2017, Kerrigan emailed Adamo to tell him how to reach her during trial. She also asked for an update on ACE's high/low counteroffer. Adamo said that the plaintiffs rejected a high/low of $250,000/$2 million. Kerrigan responded on April 25, 2017 that ACE's decision to reject the First Demand was unreasonable. (Pl. Exh. 22).

45. Adamo responded to Kerrigan's email with a letter on April 26, 2017. He stated that Leibowitz evaluated the chance of a defense verdict at 70%, which was consistent with the outcome of the mock jury. He also said that defense counsel did not recommend that they settle for $2 million. (Pl. Exh. 20).

46. Wheeler and defense counsel reported to ACE and AGLIC that the defense received several unfavorable rulings at trial. (*See, e.g.,* Pl. Exh. 80). These are the types of reports that claims handlers rely on to evaluate a claim. (Tr. 371; Kerrigan Live).

47. First, Judge Sandill excluded evidence that the Brickman truck was parked legally and that the driver had not received any citations. (Tr. 143; Adamo Depo; Pl. Exh. 77; Pl. Exh. 80). The fact that the truck was parked legally was a strong defense argument that had been compelling to the mock jury. (1 Tr. 144; Adamo Depo). This ruling was a surprise to the defense; Adamo testified that the inadmissibility of this evidence was "a new development" and "was not discussed during the course of the life of the claim with defense counsel." (Tr. 150; Adamo Depo). Kerrigan wrote that she did not know this ruling was "even a

12

remote possibility." (Pl. Exh. 83).

48. Judge Sandill also permitted the introduction of evidence about Mary Braswell's psychological state and self-destructive actions following Braswell's death. (Pl. Exh. 229). This included evidence that Mary, who was 10 or 11 at the time, cut herself, attempted to overdose, spent a week in a mental health hospital, and was on two antidepressant medications. (Tr. 291; Kerrigan Live). The defense objected to introduction of this evidence because there were no medical records for Mary. Nor was there any evidence of a causal link between Braswell's death and Mary's mental health issues. (Tr. 886-887; Leibowitz Depo). Even so, Judge Sandill permitted Michelle Braswell to testify about Mary's condition and her view that it resulted from Braswell's death. (Tr. 326; Kerrigan Live; Tr. 597; Smith Live). Smith testified that "the most impactful" evidentiary ruling on the value of the case was the decision to allow this testimony. (Tr. 627-628; Smith Live).

49. The judge permitted Michelle Braswell to testify that a Brickman employee, Tyler Renner, told her that the Brickman truck had stopped short. (Pl. Exh. 229). Defense counsel had argued that the statements Tyler Renner made to Michelle Braswell should not come in because they were hearsay. (Tr. 298-299; Kerrigan Live). Moreover, Renner later denied that he had this conversation with Michelle Braswell. (Tr. 364-365; Kerrigan Live). Michelle Braswell was a more credible witness than Renner, a 19-year-old high school dropout with a recent DUI. (Tr. 366; Kerrigan Live). The strengthening of the stop short theory was especially damaging because the physical evidence that Braswell's head was down became less damaging to the plaintiffs. If the truck suddenly stopped, it would be understandable that Braswell might have been looking down for only a second and, therefore, did not see the truck. Braswell would thereby be less negligent than if he had

been looking down for hundreds of yards before hitting the truck. (Tr. 303; Kerrigan Live). Before trial, Leibowitz informed the insurers and Brickman that the defense motion to exclude this testimony had about a 50% chance of success. (Pl. Exh. 60; Tr. 315-316; Kerrigan Live).

50. In addition to pecuniary loss past and present, the verdict form allowed the jury to award separate soft damages for loss of companionship past, loss of companionship future, mental anguish past, and mental anguish future for Michelle, Matthew, Mary, and Sandra Braswell separately. (Pl. Exh. 178; Tr. 285-289; Kerrigan Live). Kerrigan testified that "the more element[s] of damages, the more the jury can consider in an award." (Tr. 288; Kerrigan Live).

51. The verdict form also included blanks to apportion fault to Brickman, Bermea, and Braswell, rather than only Brickman and Braswell. Kerrigan testified that they did not know going into the trial that there would be multiple blanks for the two defendants since Brickman would have been vicariously liable for Bermea's fault: "[W]ith three different parties to whom the jury could assign fault . . . [t]here was more fault to spread around, which means Mark Braswell's fault would be less than we would hope." (Tr. 376; Kerrigan Live). Although Kerrigan was concerned, ultimately this did not have much impact on the verdict, as the jury did not apportion any responsibility to Bermea. (Tr. 811-812; Kerrigan Live).

52. On the other hand, defense counsel testified that it was positive for the defense that Mithoff shifted theories of liability to prioritize the stop short theory during trial. (Tr. 924; Berry Depo ("Q: [I]s it a good sign [for] the defendant if a plaintiff is changing its theory as the case develops? A: Yes. Especially in the middle of trial.")).

53. On April 28, 2017, Kerrigan emailed Adamo to ask about the status of negotiations. She pointed out that judge's decision not to allow evidence that the Brickman truck was legally parked at the time of the accident was very damaging and asked Adamo whether he knew this was a possibility. (Pl. Exh. 22). Adamo never responded to Kerrigan's email. (1Tr. 150; Adamo Depo). In an email chain with defense counsel, Berry agreed with Kerrigan that "This is certainly a factor that was in our favor that is not coming in for us." (Pl. Exh. 79).

54. At closing argument, Mithoff requested $10 million in general damages. (Tr. 887; Leibowitz Depo).

55. On May 2, 2017, at 2:14pm, Kerrigan emailed Adamo to reiterate again that ACE's refusal to accept the First Demand was unreasonable "[g]iven the adverse evidentiary and jury charge rulings by the Judge" and the fact that "Mithoff suggest[ed] a 10M general damage verdict on top of the 3.5M economic claim." (Pl. Exh. 22; Pl. Exh. 97).

56. Kerrigan emailed Skogstrom and told her to put Great American on notice in the event of a judgment in excess of $12 million. (Pl. Exh. 141, 142).

57. Berry and Mithoff began exchanging high/low offers via text. After Mithoff made a $1 million/$3 million offer, Adamo instructed Berry to inform Mithoff that the offer needed to be within ACE's $2 million policy limit. Berry did so. (Pl. Exh. 95).

58. Mithoff then made a high/low offer of $1.9 million/$2 million with taxable court costs that fell within ACE's policy (the "Second Demand"). (Pl. Exh. 96).

59. Adamo mistakenly believed that the costs term in the Second Demand implicated AGLIC's insurance layer. At 4:02pm on May 2, Adamo emailed Kerrigan to inform her that ACE would reject the offer: "Obviously, PC'S counter-demand is contrary to DC Bo Berry's

recommendations of our high/low number range and he still evaluates a defense verdict of 7 out of 10. Furthermore, PC's counter-demand would involve Zurich's layer and as you previously advised, Zurich would not contribute to any settlement." (Pl. Exh. 97).

60. Seven minutes later, at 4:09pm, Kerrigan responded asking why the offer was within Zurich's layer. She stated that the costs are ACE's responsibility. (Pl. Exh. 97). Adamo did not respond to this email.

61. At 3:10pm, Mithoff made his final offer (the "Third Demand") in an email to Berry: "Plaintiffs renew their prior offer to settle for the policy limits of $2,000,000; such offer will expire when the jury announces that it has a verdict." (Pl. Exh. 24).

62. This offer was a renewal of the First Demand. Berry forwarded the offer to Adamo and Skogstrom at 3:17pm. He did not copy Kerrigan on this email. (Pl. Exh. 24).

63. Skogstrom testified that no one asked her opinion about the demands, but she said "something to the effect of 'Maybe we should consider the 2 million, settling.'" (Tr. 1000-1001; Skogstrom Depo).

64. At 3:26pm, Berry emailed Mithoff to refuse the Third Demand. (Pl. Exh. 25). Berry testified that Adamo refused the offer on behalf of ACE. (Tr. 915; Berry Depo). ACE rejected the Third Demand because they continued to believe that there was still a 30% chance of a plaintiff verdict after closing argument. (Tr. 92, Albin testimony: "It was rejected because, again, and we viewed this case as one in which we should get a defense verdict.").

65. Although Leibowitz acknowledged that they received some adverse rulings, Leibowitz testified that, at the close of trial, he continued to believe that the settlement value of the case was $1.25-$2 million. (Tr. 241; Tr. 883; Leibowitz Depo). Berry also testified that the

adverse rulings did not change his evaluation. (Tr. 925; Berry Depo).

66. ACE offered a high/low of $650,000/$2 million, which Mithoff declined. (Pl. Exh. 25). There were no further offers on either side.

67. On May 3, 2017, the jury returned a verdict of almost $39,960,000.00. The jury proportioned 68% responsibility to Brickman and 32% to Braswell. (Pl. Ex. 99). The court entered judgment for $27,712,598.90 against Brickman. (Pl. Ex. 100).

68. AGLIC ultimately took control of the settlement negotiations post-verdict after ACE tendered $2 million. AGLIC settled for $9,750,000, of which AGLIC paid $7,750,000. AGLIC also had to pay $50,000 for a supersedeas bond for purposes of the appeal. (Tr. 280-281; Kerrigan Live). Due to the parties' settlement of the breach of contract claims, AGLIC's loss due to ACE's decision to reject the three settlement offers amounts to $7,272,321.75 in damages. (Tr. 282; Kerrigan Live).

## III.   CONCLUSIONS OF LAW

69. Under Texas law, "the duty of an insurer to exercise ordinary care in the settlement of claims to protect its insureds against judgments in excess of policy limits is generically referred to in Texas as the *Stowers* duty." *Am. Physicians Ins. Exchange v. Garcia*, 876 S.W.2d 842, 843 (Tex. 1994) (citing *Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929)).

70. The duty of ordinary care is "'that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business' in responding to settlement demands within policy limits." *Id.* at 848 (citing *Stowers*, 15 S.W.2d at 547). *Stowers* requires an insurer "to accept reasonable settlement demands within policy limits." *Id.* at 846.

71. The duty is triggered when three prerequisites are met: "(1) the claim against the insured is within the scope of coverage, (2) the demand is within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment." *Id.* at 849; *see also OneBeacon Ins. Co. v. T. Wade Welch & Associates*, 841 F.3d 669, 678 (5th Cir. 2016). The settlement offer must provide the insured a full release to qualify as a *Stowers* demand. *Id.*

72. AGLIC brought this suit against ACE under the doctrine of equitable subrogation. Equitable subrogation permits an excess insurer to bring a *Stowers* claim against the primary carrier on behalf of the insured, effectively "standing in the shoes" of the insured. *General Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 950 (5th Cir. 1999).

73. It is undisputed that the claim against the insured was within the scope of ACE's coverage and that ACE controlled the defense and settlement of the Underlying Lawsuit. This Court decided before trial that all three offers were within policy limits, unconditional, and offered a full release. Minute Entry May 23, 2019. The only remaining question is therefore whether the terms of the three offers were such that an ordinarily prudent insurer would have accepted them under the circumstances.

## A. Whether ACE Breached its Duty in Rejecting the First Demand

74. ACE acted unreasonably in preparing its valuation of the case. Adamo and Albin credibly testified that ACE reached its valuation of $600,000 by calculating the 30% chance of a plaintiff verdict by the $2 million primary limit. Although Smith's testimony about ACE's process in reaching a valuation of $600,000 was inconsistent, his testimony was not credible. Smith had ultimate responsibility for this claim. (Tr. 640; Smith Live (in response

to who made decisions about the claim, "It ultimately was a team decision, but the authority lied with me."). Moreover, given that 30% of $2 million is exactly $600,000, it is not credible that ACE happened to reach a value of $600,000 without thinking about that calculation.

75. A valuation based solely on a primary insurer's limits is contrary to the purpose of *Stowers*. *Stowers* obligates primary insurers to look at the potential of an excess verdict *to the insured*, not merely the potential loss of the primary insurer. *See, e.g., State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38, 41 (1998) (noting that the question is "the likelihood and degree of the insured's potential exposure to an excess judgment."). Accordingly, ACE's valuation was not in compliance with *Stowers* principles because it focused on ACE's policy limits, rather than Brickman's total potential exposure.

76. The Court may consider ACE's conduct in evaluating whether ACE breached its obligations under *Stowers*. In *Stowers*, the court held that "the testimony offered by plaintiff, to the effect that it was a rule of the indemnity company never to make a settlement for more than one-half the amount of the policy, should have been admitted as bearing on the issue of negligence on the party of the indemnity company." *G.A. Stowers Furniture Co.*, 15 S.W.2d at 548; *see also Home State Cty. Mut. Ins. Co. v. Horn*, 2008 WL 2514332, at *3 (Ct. App. Tyler 2008) ("In determining whether the claimant's demand was reasonable under the circumstances, although with other factors, evidence concerning claims investigation, trial defense, and conduct during settlement negotiations is considered. Nevertheless, the ultimate issue remains whether the claimant's demand was reasonable under the circumstances such that an ordinarily prudent insurer would have accepted it."); *Gulf Ins. Co. v. Jones*, 2003 WL 22208551, at *3-4 (N.D. Tex. Sept. 24,

2003) (noting that the focus in a *Stowers* suit is solely on the reasonableness of the settlement offer, but also considering evidence that the insurer was negligent; not just looking at the offer and its reasonableness, but at the conduct of the claims adjuster and defense counsel and ultimately finding that there was not adequate evidence of negligence).

77. However, the reasonableness of the actual valuation is not the ultimate inquiry in a *Stowers* claim. The key issue is whether a reasonably prudent insurer would have accepted the offer. The Supreme Court of Texas has held that "[i]n the context of a *Stowers* lawsuit, evidence concerning claims investigation, trial defense, and conduct during settlement negotiations is necessarily subsidiary to the ultimate issue of whether the claimant's demand was reasonable under the circumstances, such that an ordinarily prudent insurer would accept it." *Am. Physicians Ins. Exchange v. Garcia*, 876 S.W.2d 842, 849 (Tex. 1994) (emphasis added).

78. ACE did not breach its duty under *Stowers* when it rejected the First Demand. At that point, ACE was aware of the weaknesses in the case, but a reasonable insurer could still have been confident in a defense verdict. Although there was a known risk that Judge Sandill would make adverse rulings at trial, defense counsel evaluated the risks at 50-50. Accordingly, a reasonable insurer could be cautiously optimistic that the jury would conclude that Braswell was more than 50% liable for the accident. A reasonable insurer could continue to believe that the case had a settlement value of $1.25 million to $2 million, as reflected in the August Memo, and decline an offer at the top of that range.

**B.    Whether ACE Breached Its Duty in Rejecting the Second and Third Demands**

79. However, ACE did breach its duty when it rejected the Second and Third Demands. When Mithoff made these demands, ACE was aware of all of the adverse rulings and evidence

presented during trial including, most importantly, the extensive evidence about Mary Braswell, Michelle Braswell's testimony about the stop short theory, and Judge Sandill's decision not to allow testimony that the Brickman truck was legally parked and had not received any citations. These rulings, which exacerbated the known weaknesses in the case, should have changed ACE's calculus.

80. In particular, Judge Sandill's decision not to allow evidence that the Brickman truck was legally parked should have been of significant concern, as it does not appear that the insurers were prepared for this decision.

81. Both the Second and Third Demands were within defense counsel's original settlement range and were for amounts that were viewed as reasonable by defense counsel, AGLIC, and Brickman.

82. A reasonable insurer would have reevaluated the settlement value of the case because, after these rulings, it would have been aware that there was little chance that the jury would determine that Mark Braswell was more than 50% liable.

83. From the beginning, defense counsel determined that lost earning claim was reasonably between $2.8 million and $3.365 million, which is well above the $1.9-$2 million offered in the Second and Third Demands. Moreover, the evidence at trial only increased the known sympathy factor and attendant chance of large soft damages. Accordingly, a reasonable insurer would have been aware that the award would likely be well above the amount offered in the Second and Third Demands.

84. A reasonable insurer would thus have determined that an offer at the top of the original range suggested by defense counsel was proper given the enhanced possibility of a verdict well above $2 million.

85. ACE therefore breached its obligations under *Stowers* when it rejected the Second and Third Demands.

## IV.  CONCLUSION

Any Finding of Fact that should be a Conclusion of Law shall be deemed such, and any Conclusion of Law that should be a Finding of Fact shall be deemed such.

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds and holds for AGLIC in the amount of $7,272,321.75.

Prejudgment interest begins to accrue on the date this suit was filed, which is February 9, 2018. (Doc. No. 1). *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998). Under Texas law, prejudgment interest accrues at the rate for post-judgment interest and is computed as simple interest. The post-judgment interest rate this month is 1.75%. Parties should confer and agree on prejudgment interest.

For the current interest rate, see: https://occc.texas.gov/publications/interest-rates

**IT IS SO ORDERED.**

**SIGNED** this 11th day of September, 2019.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE