**From:** Andrew Leibowitz[Leibowitz@berryfirm.com]
**Sent:** 25 January 2016 17:32:57
**To:** Nowak, Cheryl L; Denise Skogstrom (DSkogstrom@valleycrest.com) (DSkogstrom@valleycrest.com)
**Cc:** Adamo, Gabriel; Terese Kerrigan (terese.kerrigan@zurichna.com); Steven Shabkie (SShabkie@valleycrest.com)
**Subject:** Braswell v. Brickman - ACE/Chubb Claim No.: JY14J0280830 - ESIS No.: 6194254330527X - Zurich Excess 9420176361
**Attachments:** image001.jpg, BIF'02al(Pltf disc responses).docx, BIF'02al(Pltf disc responses).pdf

All,

Attached is a report (in Word and PDF formats) summarizing Plaintiffs' discovery responses. Please let me know if you have any questions. Andrew

cid:image001.jpg@01D08752.DD0F7470

Andrew Leibowitz | Partner
1412 MAIN STREET | SUITE 2300 | DALLAS, TX 75202 | 214.915.9800 | 214.752.8250 fax
100 PARK AVENUE | SUITE 713 | OKLAHOMA CITY, OK 73102 | 405.418.2083 | 405.604.0392 fax
1200 SMITH STREET | SUITE 1600 | HOUSTON, TX 77002 | 713.353.4716 | 713.353.4601 fax
email: leibowitz@berryfirm.com <mailto:leibowitz@berryfirm.com> | www.berryfirm.com <http://www.berryfirm.com/>

4:18-cv-382
Plaintiff's Exhibit
45
exhibitsticker.com



# Memorandum

**TO:** Background Information File

**FROM:** Andrew Leibowitz

**RE:** Braswell v. The Brickman Group

**FILE NO:** 00500.119

**DATE:** January 25, 2016

**SUBJECT:** Plaintiffs' Discovery Responses

The following is a summary of Plaintiffs' responses to our discovery requests.

**Michelle Braswell's Responses to Interrogatories**

Michelle Braswell is currently 43 years old with a date of birth of August 4, 1972. With respect to the accident, Plaintiff referred us to the Police Report and the statement she gave to them. In that report she states that on June 25, 2015 she spoke with Tyler Renner, an employee of Brickman, who told her that he was instructed not to discuss the accident but since she was Mark's wife, he felt she needed to know what happened. Tyler explained that he was coming back from lunch and was on the northbound side of N. Bridgeland Lake Parkway. He stated the truck and trailer involved in the accident was also traveling northbound and they u-turned at the stop sign at Bridge Cove Drive. He advised after turning, the truck and trailer proceeded past Mark on his bicycle, and pulled over in front of Mark and stopped. He stated that the cyclist did not have enough time to react, because the driver of the trailer never saw Mark. Tyler added that the driver cannot see out the rear of the vehicle because the height of the tailgate and the 2 mowers and additional lawn equipment obstruct the driver's view. Tyler stated that the crew had just exited the vehicle because they were going to retrieve a weed eater from the bed of the pick up when Mark struck the trailer. He said the truck and trailer was not "parked" but that it had just stopped quickly. In her interrogatory responses, she added that Tyler also told her that Brickman did have a policy about placing cones around parked company vehicles but that the truck had not been stopped long enough to place cones and the policy was not enforced.

As you know, Tyler is no longer employed with Brickman and when I spoke with him about the accident, he denied saying that the truck stopped short. He specifically told me he did not see the accident. In his statement to the Police, he said that he did not see the accident but observed the truck and trailer driving and turning around and he observed the bicyclist riding towards the end of the roadway and turning around (presumably this means they were on northbound side of N. Bridgeland Lake Parkway and they turned around to go southbound which is where the accident occurred). He does

tell the Police that he felt compelled to tell Mrs. Braswell about what he knew, including that it was strict company policy to use cones when on main streets. His actual written statement to the Police confirms he did not see the accident and that a week or so later, Guillermo told him they stopped to get the edger out of the trailer and they made it to the back of the trailer when Plaintiff hit it. They did not know that he was there.

Plaintiff also states that in late summer of 2014, after the accident, she was riding her bike in Oak Meadow Park in Bridgeland and saw Guillermo Bermea. She approached Mr. Bermea and asked him if he was the driver the day of her husband's fatal accident. He told her yes and that he had an employee who had left early that day who had been weed eating along the parkway. Guillermo said he was taking another employee to finish the remaining weed eating and was looking to see where the previous employee had stopped working. He stated he stopped the truck and was starting to exit the vehicle when he heard an impact. Guillermo said the accident bothers him every day and that he is also a father. He stated he may request a transfer because it bothered him too much to continue working in my neighborhood. She told him that her heart breaks daily for her family and that she was sorry he was suffering too.

In addition, in late May (unclear what year), she saw a Brickman truck and trailer parked and unloading equipment. She saw them putting out cones and asked them if that was a new company policy. They stated they always put cones out. She told them they were not out on the day her husband was killed.

As for the day of the accident, she left for work around 6:15-6:30 AM. Mark woke up to make breakfast and get their kids ready for school. She had some conversations with Mark and text messages regarding their son. She returned to her office around 3:00 PM. She then stated that "I first became aware that something might be wrong when I received a call from one of my friends who lives in my neighborhood, Sally Cobb. She called to see if Mark or I were home and could come help at an accident scene. She said no one (EMS) was there to help and everyone was just standing around, not doing anything. This was at 3:37 p.m. I tried calling Mark, but assumed he was just unreachable. At 4:04 p.m., I received a call from our Pastor and friend, Ray Hughes. He was at Pope Elementary School and called because no one was there to pick up my daughter. This was odd because Mark was supposed to take our daughter and Ray's daughter to rehearsal at 5 p.m. I began gathering my things to go home and try to locate Mark. I made several phone calls to my son, to Mark and to my house. I finally deduced that Mark was the person involved in the accident when I called CFVFD dispatch." She never went to the scene of the accident. She went directly from work to the hospital.

Plaintiff alleges that she has suffered mental anguish since the death of her husband. He was her best friend. They had started dated at a young age and spent their whole adult life together. They had started planning their retirement as they had both close to 20 years of service in the fire department.

She states that "losing Mark was such a huge unexpected, earth shattering loss. He was truly my better half, we balanced each other. He was strong in areas where I lacked, and vice versa. He was a phenomenal father and husband. I could and did talk to

Mark about anything. We truly had an unconditional love. I have always been a strong person, but Mark's death has hurt me to a level I didn't know I could hurt. I couldn't sleep or eat for a long time. For many months, I would stay up very late. It was like I was waiting for Mark to come home. Never before in my life have I literally been brought to the ground by tears. I look at his picture from the funeral and hold his clothes wishing I could hold him once more. I get physically ill every time I think about the accident, and Mark lying dying in the street. Sally Cobb's words resonate in my head about the person lying, bleeding in the street and "no one doing anything to help." My feelings of heartache and loss are compounded because not only did I lose my partner, my best friend; but my children lost their father."

Plaintiff attended peer group counseling at Bo's Place in Houston, Texas 77054 for a 9 week program that began in September 2014. She saw Dr. Sam Buser, the HFD counselor, in Houston, Texas. She also saw Dr. Jose Anzaldua in Sugar Land, Texas for depression. She is not making a claim for lost income from her own employment.

**Estate's Responses to Interrogatories**

William Markley Braswell (Mark) was 43 years old at the time of the accident (D/O/B 6/14/70) and was married to Michelle Braswell. They had 2 children – Matthew Dalton Braswell and Mary Elizabeth Braswell – who both resided with them.

It is alleged they incurred out of pocket medical expenses of approximately $400 and funeral expenses of $3,146. They do not yet have the billing for the treatment rendered to Mark at the scene of the accident.

Mark was a Fire Captain with the City of Houston Fire Department and was hired in January of 1993. He was also a paid aide for the Cy-Fair Volunteer Fire Department as an Assistant Chief over support services. He had been with the Cy-Fair Volunteer Fire Department in different capacities since 1988. Mark was currently employed with both agencies at the time of his death. His Houston Fire Department income was approximately $76,000 per year.

With respect to the accident, it is stated that Mark woke up around 6 a.m. to make their children breakfast and to get them off to school. He drove their daughter to school and dropped her off around 8:15 a.m. Michelle is unaware of the events of the rest of Mark's day because she was at work. She states that Mark was riding his bike at the time of accident but she is unaware of the time he started riding his bike because she was at work. She is unaware of the route he took on the date of the accident. To her knowledge Mark was riding his bike alone on the date of accident. Her neighbor, Robert Schaffner, stated he saw Mark in our garage before he departed for his bike ride. He said Mark was wearing a yellow shirt and black shorts. At the time of the accident, Mark had his phone, sunglasses, bike shoes, helmet, GPS watch and headphones.

**Children's Responses to Interrogatories (by Michelle)**

Matthew Braswell is currently 15 years old and Mary Braswell is 11 years old. They

have no other siblings and Mark Braswell has no other children. Both children are claiming mental anguish from the death of their father.

It is alleged that they have "both suffered emotional and mental anguish from the unexpected loss of their father. On May 16th, I had to tell them both their father was dead. I will never forget their look of fear, sadness, and heartbreak. How do I begin to explain all the times they are sad, or disappointed. It happens every day, everywhere we go. At the grocery store a child walks in holding her father's hand, Mary will never have that again. At the park, a boy plays ball with his Dad, Matt will never have that. The school holds father only events, Fathers and Flashlights campout, Father/Daughter dances, Donuts with Dad....my kids will never get to do those things again. Not to mention all the milestones that a child needs their father for. Matt, talking about puberty, learning to shave, learning to drive.....meeting Mary's first date, walking Mary down the aisle, having their Dad to be a grandpa. My children will never have those things."

They were both seen by Dr. Sam Buser in Houston, Texas for counseling after their father's death. They also attended peer group counseling at Bo's Place for a 9 week program which began in September 2014. Both Matt and Mary also met with their school counselors on several occasions.

**Sandra Braswell's Responses to Interrogatories**

Sandra is the mother of Mark Braswell. She is currently 75 years old and lives in Houston, Texas. His father was Dr. Joel Henry Braswell who died of cancer at 69 years old. Mark was the youngest of her 2 sons.

As for her mental anguish, she states as follows:

"As a result of Marks' death I have suffered mental anguish. I raised two sons, Mark Braswell was my younger son. I have always been fortunate to live near my sons. We all had a very close bond. When I arrived home on May 16, 2014 to find a Cy-Fair volunteer vehicle in my driveway I knew something bad had happened. I did not want to ask the question "what's wrong?" but it came out of me. I was told there was a serious accident and when I asked if Mark was dead, my world as I knew it fell apart. With his response of yes, my life as I knew it died with him. I was taken to Hermann Hospital to join the other family members who wondered what could have happened. The nurses uncovered one hand for me touch. I wanted to tear off the cover and say that it is not my son, but a mother can recognize her son's hand, she has held it all through his life, when he was an infant, a boy, a man, but one last time will not be enough to last my lifetime.
I had trouble sleeping after Mark's death and was only sleeping one or two hours a night. Because I was so upset, I wasn't following my diet that had allowed my diabetes to be under control. I cannot look at pictures of Mark without crying. It is hard to go to Mark's house even today. Sometimes I can just drive into his subdivision and start crying because I want this to just be a bad dream. I want Mark to see Matt swim his first high school meet and to hear his dad yell, "way to go Bubsy!" I want him to hear Mary play the violin at her first recital, for him to pick her up and tell her how wonderfully she did and give her a big hug and bouquet of flowers."

Sandra Braswell also alleges to have spoken with Tyler Renner. She spoke with him on or around June 25, 2014 near Mark's home. She states as follows:

"I noticed a Brickman truck and crew trimming in the cul-de-sac. I noticed they had cones and lights. I commented to two men that I saw they had cones out and lights on their truck. I thanked them for putting them out. Mr. Renner said they were required to put cones out when they stopped. I asked them if they were always required to do so when they stopped and he said "yes." I told him my son was the person that was killed in the accident with the Brickman truck and trailer. He said how sorry he was and he said that after the accident the trucks are no longer allowed to park on the parkway and must have cones out as well as flashing lights on the top and in the rear. He stated they were always supposed to put out the cones and use flashing lights, but sometimes if it was a quick stop the cones and lights were not used. He stated that now there were no exceptions and if another Brickman truck sees someone not using the cones and lights, the driver is to signal them and tell them to put on their flashers. Mr. Renner said he was working on the other side of the parkway when he saw Mark go by on his bike and soon saw the Brickman truck go by and make a turn onto the part of the parkway where Mark was riding. He said when the accident occurred, the driver and passenger had just exited the truck and was going back to the rear. They had no time to put down the trailer gate nor put out the cones. He said the company called all the workers back to where they meet, told them about the accident and to come back in the morning to learn the details from the office. They were told not to speak to the family. Tyler said he was so upset over the accident he went on the internet to see who this person was. Michelle came home from work about then and I told her what Tyler said. She went over and told him who she was. He said the men probably could not see what was behind the trailer because they were carrying two mowers and it is hard to see through the gates."

**<u>Documents produced in Response to Request for Production</u>**

Plaintiff's produced the Police Reports which we have already received. They produced a funeral home bill from Beresford Funeral Services which indicates total funeral home charges of $3,038 and a monument which totaled $5,575. Income tax returns for 2009 to 2012 and 2014 were provided. In 2012, Mark earning $71,286.11 from the City of Houston and $38,124 from Cy-Fair Volunteer Fire Department. Their total adjusted gross income was $189,271. In 2014 (he died in May), Mark earned $25,066.60 from the City of Houston and $16,905.52 from Cy-Fair Volunteer Fire Department.

We were previously provided with the autopsy report. According to same, the cause of death was "blunt trauma of the head." External examination of his head was noted to have "an approximate 7 inch gaping laceration with exposed fractured skull and disrupted brain extends across the right frontoparietal scalp." He also had 2 ¼ inch red contusions on the bridge of the nose and right ala. Blood exudes from his right ear. Internal examination of the head noted a subscapular hemorrhage on top of the head associated with the laceration. Extensive calvarium and basilar skull fractures were present. There were linear and comminuted fractures involving all bones of the base of the skull with a semicircular fracture along the foramen magnum. He suffered numerous

contusions to the torso and extremities and sternum and rib fractures. He also had a contusion of the liver and contusions of the left lung which also contained blood.

There was nothing in the autopsy report which showed that Plaintiff had a medical event that led to his accident. The report also shows that he was generally in a good health for a man his age.

**END OF MEMORANDUM**